The next matter, number 251324, E. David Westcott, et al. v. The Honorable Valerie Stanfill, et al. At this time, would counsel for the appellants please come to the podium and introduce themselves on the record to begin? Good morning. May it please the Court, Kyle Singall for appellants, E. David Westcott, and Russell Johnson-Bopane. With me at counsel table is Stephen Smith. We respectfully request three minutes for rebuttal. Thank you. Under Janus, compelling IULTA participation compels a subsidy in violation of the First Amendment when interest would otherwise accrue to the client and the fund support advocacy on matters of public concern. This Court should reverse the District Court's contrary ruling for two reasons. First, the District Court ignored the usual pleading stage standards in failing to credit plaintiffs' factual allegations, namely the allegation that plaintiffs had no alternative but to use the IULTA and their allegation that they understand and dislike the connection between their funds and the causes those funds support. Can I just ask, you allege that here interest would have accrued from these funds, right? Yes, that's in paragraph 90 of the admitted complaint. Do you allege anywhere that you didn't know that at the time you put the funds into IULTA? What was alleged is that they sincerely believed they had no alternative. To using IULTA. To using IULTA under the circumstances. As a general matter, that I understand is the point that you're making, that you couldn't just avoid IULTA altogether. Right. I'm asking something specific about these funds, which is you allege that they would accrue interest. Obviously, if that's known, then it's clear you don't have to put them in the IULTA fund. We allege as a factual matter in hindsight that it's known. There's no allegation as to the expectation of the lawyer or the client at the time. Either way. Either way, exactly. So that's a factual question that could be relevant to whether there was a- Don't you have the burden to allege that you at the time had the view that you had to put them in there because you didn't know it was going to accrue interest? All you allege is that you don't say in hindsight. You just allege it would accrue interest. Well, that is a factual statement about what happened, right? The factual statement is interest accrued, period. And the factual statement is that there was no practical alternative available, and if there were, they would have used it. Now, it sounds like Your Honor is asking for sort of a subsidiary one step back. Why was there no reasonable alternative? Well, because they didn't expect- Is that in the complaint? No, but there's no reason that every sort of subsidiary fact going back to the beginning of time would need to be in the complaint. I'm not asking for every fact beginning of time. I'm asking for the right fact. All right, but that specific fact. There's no allegation either way on that fact, but there's no burden to- But why is there not an obligation to allege that? It is the case that if you knew that it would accrue interest, you wouldn't have to comply with the alternative. Correct. Well, if we knew and if it were reasonable. That's the problem is that it has to be a reasonable expectation under Main Bar Rule 1.15. There's no allegation any way about what expectations the people had at the time they put it in the account. Your Honor, we're entitled to reasonable inferences. A reasonable inference from the allegation that RJB fears punishment from the bar is that- As to these particular funds? As to these particular funds. Where is that in the complaint? On page 16 of the amended complaint. It was in compliance with the mandatory IALTA program. It was that the program- RJB and Westcott sincerely believe they've been compelled to contribute to these causes. And- Let's see what other language I can point Your Honor to. I mean, starting at 82, they've been compelled there. 85, there's no practical alternative. 86, they would employ that rather than storing funds in the IALTA account. The reason- and here, 87. The scheme injures RJB and Westcott by imposing an imminent threat of severe penalties up to and including disbarment for failing to store client-retained funds in the IALTA account. And that's the reason provided as to why they stored these funds into- Does it say that? That that's the reason? That's a reasonable inference. That's in paragraphs 82 through 87. And then in 88, it says they believe they've been compelled by all of this to- by means of the IALTA program we just described to use it. And then it says that Westcott transmitted the retainer for deposit into the account. But for that, the IALTA, that would not have been deposited into the IALTA account. And it was in compliance with the program that the interest accrued. And surely, I mean, if we're talking about the extent to which we're entitled to reasonable inferences, I think I would point your honors to- Okay, there was a Dover v. City of Boston case that both your honor and Judge Rickleman were on, decided July of this year, where much greater inferences were drawn in favor of the plaintiffs than what we're asking your honor to draw here. I mean, this is, in my mind, stated on that page of the complaint. The precise words, you know, they had no expectation that it would make interest at the moment of the deposit are not stated there. But surely, that's a reasonable inference. Because if they did have an expectation that it would make interest, then, as we know, they wouldn't have had to put it in the IALTA account. Counsel, can I just ask you a follow-up about that? Because I was trying to read the complaint and the brief together to just sort of understand practically what happened here. So, you pointed out in your brief that the rule is that if you have a reasonable expectation, that's the phrase I believe, that the funds could earn interest, it's actually mandatory, correct, for the lawyer to put it into a non-IALTA account so the interest can accrue. If it's a reasonable expectation that it will earn net interest, that's right. Okay. Unless the client directs otherwise, then it shall go into a client trust account. That's 115B3. Yes. And then I think another subsection of 1.15 talks about the factors that the lawyer would have to consider in figuring out what makes the expectation reasonable or not. So, I think it talks about the principal amount involved. This is 7I in 1.15. So, you look at the principal involved, the available interest or dividend rates, and the time the funds are likely to be held. So, all common sense factors that a lawyer would have to consider. So, how should we understand the allegations in the complaint from your standpoint? We should understand that the lawyer at the time the 2,500 was deposited had no reasonable expectation that it could earn interest. Correct, because the alternative. But, in fact, it did? But, in fact, it did earn interest. That's right. And how do we know that? Because if it was put into, in other words, I'm trying to give you the inferences. Absolutely. That sounds like great factual questions. If it was placed into an IOLTA account and pooled, how do we know factually that it would have earned interest in a non-IOLTA account? Do you understand my question? Yes, Your Honor. I mean, as a lawyer, I have an IOLTA account, and on remand and discovery, they can request the appellant's bank records. And I see the amount of interest that is generated and transferred to the state in my IOLTA accounts every month. That's certainly a factual question that can be determined. And if it turns out that there was, you know, no insufficient net interest for appellants to have any funds that actually would have accrued to clients. The gentleman's question is different. If I'm following, she's not challenging that we have to accept as true that it would earn interest in a non-IOLTA account. We're asking, given that you've alleged that and that we take that as true, what would be our basis for thinking you reasonably understood it wouldn't have done that? Interest rates have gone up since 2020. Is that in the complaint? No. In other words, we have nothing in the complaint that enables us to get from the fact you allege, which we take to be true, that it did earn interest to the necessary allegation that you reasonably thought it wouldn't. Well, there are two ways you can draw the inference from the fact that interest accrued. One is you could infer against us that, as I think the district court did, that the lawyers were mismanaging their money and that they should have known all along that it would have accrued net interest, and thus the claim fails. The alternative inference is they didn't have that expectation. They didn't have the affirmative expectation that it would earn net interest, and thus it was proper and, in fact, required shall be placed into the IOLTA account. And the fact that it, at the end of the day, earned interest doesn't change what their obligation was to do under 1.15B4. I guess I don't understand why. I understand why we wouldn't necessarily take an adverse interest if you mismanaged your account. I'm just saying in the absence of any allegation one way or the other, why wouldn't I just say I don't know why you put it in the account? All I know is it earned interest. Well, it wasn't that I don't know. It doesn't have to be in the account when it doesn't. You haven't said one way or the other why you didn't. Because the complaint says as a factual matter they felt compelled to use the account. And the only reasonable reason they would have, the only reasonable basis for that would be that they believed the IOLTA required them to do so, which is also in the complaint, that the IOLTA compelled them to use it. And if they had the affirmative expectation that there wouldn't be net interest, then they couldn't claim that they felt compelled to use the IOLTA. Your Honor, I would direct the Court to, in terms of contextualizing the Janus part of this, or actually rather the Washington v. Mass Bar part of this case, right back through Washington v. Mass Bar. The second to last paragraph of that case that I think causes the most trouble in that it seems to indicate that after the Court first explained why the plaintiffs there had standing to pursue their claims, nevertheless didn't have a First Amendment claim because it, quote, wasn't their money, the defendants have also raised various arguments involving traceability. And I just, you know, the core function of Janus here is to put to rest those kinds of concerns. No matter how small the amount of interest, if the money is being taken from plaintiffs and used to subsidize views on matters of public concern, Janus forbids that. Your Honor, I understand the claim because I'm puzzled by this aspect of your argument. You seem to think it's important that you alleged that it earned interest. Well, I think it's important that the plaintiffs were required to use the IOLTA. That's a different point. You seem to think it's important that it earned interest to your First Amendment claim. Is that not actually important to your First Amendment claim? I think it's important because otherwise there's no subsidy occurring. I thought you, maybe just to be specific, you seem to allege that it would have earned interest in a non-IOLTA account. Right, correct. Is that important to your First Amendment claim or not? Not to the First Amendment claim, no. To the First Amendment claim, what matters is that the And so what is the significance of that allegation and the complaint to you? Why is it in there? What work is it doing? Because the fact that you would have earned interest, whether you earned interest or not in a non-IOLTA account, is what determines your obligation to use the IOLTA account. That's what that's doing. So how can it be helpful to you to say it would have earned interest in a non-IOLTA account? Because if it wouldn't have earned interest, right, then you Okay. I'm just puzzled. No, no, okay. You seem to be thinking There's still harm. The way I read your argument, it sounded like it was important to the First Amendment complaint that there was interest here that would have been earned outside of IOLTA, as if the interest earned within IOLTA from an account that otherwise would not on its own generate interest might not support the First Amendment claim. Either way, the fact that interest is going, whether it's IOLTA or non-IOLTA interest, there's no difference there in the First Amendment harm, Your Honor. All right, and that's because What supports that latter contention? That it's the That even if the only interest accrued is a consequence of pooling, and if there would have been no interest on its own, there's still a First Amendment problem. Is that based on Phillips and all that? Phillips and Brown. The client might rather not have his funds being used in any way to support causes he opposes. That's right, Your Honor. Can I ask just one more question on this topic while we're on it? When I read Brown, the way that I understood it, and tell me if you see it differently, is that the court in Brown seemed to say that if an attorney makes a mistake, a good-faith mistake, which is, I think, what you're alleging here. You had a reasonable expectation it wouldn't earn interest, but it did. If an attorney makes a mistake, then the remedy is really that the attorney then needs to pay the client whatever interest the client would have earned, and, therefore, there still isn't a constitutional problem. I know in Brown it was a different claim. It wasn't a First Amendment claim, but the essence of what the court was saying is, okay, the attorney made a predictive mistake. The money was a nominal amount, but it turns out it would have earned some interest. The remedy is not to say the government has engaged in a taking and that the government owes the person money. The remedy is that the attorney now has to pay the interest. I mean, I think both things can be true. But do you think I'm reading Brown correctly? I think that, insofar as that is a remedy, yes, but it's not sufficient to make the client whole because the client's funds were still used in the First Amendment context. Brown was takings. In the First Amendment context, the client's funds are still being used to support a cause he opposes. But why would that be true if the attorney reimburses the client? Because then the client has the funds. No, but the recipient organization wouldn't have gotten the interest that came from the client's principal, and as Brown quotes the old English adage, right, interest shall follow the principal as the shadow of the body. It's the client's principal that the client has the right not to have used to support the cause he opposes. You say the subsidy is from the use. The subsidy is from the use, and that remains regardless. So all we're talking about in terms of was the IULTA required to be used here is, honestly, yes, to your point, separate from this question about is the subsidy constitutional. So you think there's a harm even if the client is made whole monetarily?  Thank you, Your Honors. Good morning, Your Honors, and may it please the Court, Assistant Attorney General Jason Anton on behalf of Chief Justice Valerie Stanfill and Court Administrator Amy Quinlan, my apologies. For four decades, Maine's IULTA program has helped fund legal aid for Mainers who need it, and remarkably it does so at no cost to taxpayers, attorneys, or their clients. If you don't mind, could we just get right to the facts of this case? Of course. There's two reasons in particular, and I'm happy to address the argumentation with my colleague on the other side, that there's no First Amendment harm here. The first is what the first line of questioning addressed, that the IULTA program is narrow in scope and, in effect, not compulsory. That's because it only applies to funds that are held in trust for clients, and even then only those funds that are so small will help them. I understand that that would be a broad holding about the IULTA program. Yes. In this particular case, there's a question about whether the complaint sufficiently alleged, given that it alleges that these funds would have generated interest outside of IULTA. Obviously, if that was known at the beginning, IULTA has no application to the funds. What do you have to say about whether the complaint sufficiently alleged that they reasonably believe, nonetheless, that they had to put them in there because they expected it wouldn't generate funds, interest outside the IULTA account? As we argued in our brief, Your Honor, the only allegations with respect to what the funds would have done are paragraphs 90 and 91 of the complaint. Those refer to the interest. It was deposited in an account that generated interest, and that interest did not accrue to Mr. Westcott's benefit. The first time in which there's any argument at all about what the expectations were of Mr. Westcott is the reply brief before this Court. There are no allegations in the complaint about the expectations that Mr. Westcott had, nor is it in the briefing before the district court. So that certainly illustrates how there's no reasonable inference to make on behalf of the district court. And what do you say to their contention that, okay, yeah, they don't use the word expectations, they never say anything about their expectations, but they say we were reasonably feared we had to put them in, we had no other alternatives. Why don't those justify an implication that the only reason they put these in is because they thought at the beginning that it wouldn't do the thing that it ended up doing? It's ultimately a different argument. If you look at the argumentation below, it's about a fear of prosecution and essentially putting a thumb on the scale in favor of putting money in an IULTA account, but there's no argumentation for us to respond to about what those expectations were and why they believed an IULTA account had to be used. And Rule 1.15, the legal question, is not entitled to any reasonable inferences and is quite clear about the money that has to be deposited in order to gain interest for the client must meet those criteria, be so small, or that money that is going to earn net interest, i.e. it is not so small or held for so short a period of time that it would not otherwise earn net interest. And, in fact, there's even more protection for attorneys within that rule. It talks about the exercise of a good-faith judgment and the sound judgment of the attorney and, in fact, expressly indicates that where the attorney exercises that good-faith judgment, they are not subject to ethical persecution or violation of the rules. The amount here was what? $2,500, I believe, Your Honor. Do you have a sense of, or is there anything in the record that gives us a sense of what the typical amounts are that are put in under IULTA? There's nothing in the record, Your Honor, at the motion-to-dismiss stage that we were arguing, but certainly the rule talks about how IULTA accounts give the highest interest rates available and that banks are certainly within their rights, and my understanding, again, this is outside the record, but that in practice they tend to waive fees or reduce fees. That's how these IULTA programs tend to produce interest where traditional interest-bearing accounts don't. That's the very reason IULTA programs exist in every state and in the District of Columbia and Puerto Rico. But we have nothing in the record that indicates that $2,500 is the kind of amount that, ordinarily, you would think does go into an IULTA account. Yes, there's nothing in the record dictating that one way or the other. There are no allegations about it. There's nothing in the rule or guidance that gives an idea of what a small amount is? No, and that's the whole point, is that it is entrusted to the attorney's exercise of discretion based on the factors that Judge Reckleman pointed out in Rule 1.5 of the main rules of professional conduct. So $2,500 held for a long period of time could certainly produce enough interest. I don't think there's a bright-line rule. It's an assessment of the case. And, in fact, Rule 1.15 requires that if the expectations change, like let's say, for example, an attorney puts money in an account expecting it to quickly settle such that it wouldn't outstrip the amount of administrative costs associated with depositing that money. If those circumstances changed, in fact, there's a thumb on the scale in favor of putting that money back in a traditional interest-bearing account, and Rule 1.15 requires that that change be made when the expectations of the attorney change. Can I ask you another practical question? I understand it's a motion to dismiss, but I assume this is something that is actually just discoverable through a legal search. Do you know if there are, in fact, proceedings instituted against lawyers in Maine for erroneously putting money into interest-bearing accounts rather than IOLTA accounts? In other words, a lawyer exercises the reasonable expectation but maybe got it wrong, you know, as the plaintiff here is suggesting. Has there ever been a bar proceeding against someone who erroneously put it into account to get interest for the client? I'm unaware of any, but I want to be clear about what the rule requires. Error is not a basis for a prosecution under this rule. I understand. You'd have to find that there was bad faith, et cetera, but to your knowledge. My understanding is that most of the bar violation cases that come out of this are improper intermingling of funds, where you have a single account where the firm's operating funds are intermingled with funds that are held for a client. That tends to produce bar cases. I'm unaware of any bar case that has been instituted. That doesn't mean it doesn't exist. I'm just unaware of one for violation of this rule where the money has been put in the wrong type of account, interest-bearing versus IOLTA account. I also want to quickly address, Your Honors, the question of Janice, which is really where the other side hangs their hat. Janice doesn't have anything to say about this case or Washington Legal Foundation. No party in Janice argued, and the court did not address, the question of whether speech had been compelled. That entire decision hinges upon whether the agency fee at issue in that case passed exacting scrutiny, namely whether the interest in avoiding free riders or in labor peace was sufficient to justify. And the facts are quite different. In that case, you have a direct deduction from a paycheck for the express purpose of speech on behalf of the person who suffered the paycheck deduction. Here we have something quite a bit different, where an attorney gives money to, where a client gives money to an attorney. It's deposited in an account. That account generates interest that did not otherwise exist, and then it's transferred to the main justice foundation, which in turn transfers it to these other organizations. There's no pecuniary loss. This case isn't a case in which the interest doesn't otherwise exist. Well, there's only two scenarios, and this is, I think, what Judge Walker was pointing out. Either the interest would not otherwise exist, in which case it's put in an IOLTA account, or the alternative is the interest would exist and it should go in. No, no. Are you referring to the error that was made? Is that your point? If we credit their reading of the complaint, what happens is I reasonably expect it won't accrue interest, so I'm compelled to put it into the IOLTA account, but that it does accrue interest, so this is actually something. It would have accrued interest outside of it, so actually this is money that I would have had outside of IOLTA that's being taken inside IOLTA for things I don't like. So they say that's like Janus. I'm not sure there's sufficient factual support in the complaint for that proposition. Well, that's fine, but then we don't get to the Janus issue. If there is sufficient factual support for the claimant, then the Janus issue has to proceed on the understanding that this is interest that would have been earned outside IOLTA, right? Well, sir, the initial question of whether there's sufficient factual support for that in the complaint, I'm not sure how it would be calculated in the hypothetical alternative if the money had been put in another account. I know that's the expectation here, but there isn't factual support for that in the complaint. One thing you may be pointing up is all the more problematic nature of the allegations or the deficiencies in it because given how the rule operates, the idea that you could have an account in IOLTA, properly placed in IOLTA, that would have actually earned interest outside of IOLTA does raise some questions about what made you think you had to put it into IOLTA in the first place that you would hope would have been addressed in the complaint. I take that point. I'm just saying that if we got past all those hurdles and it was properly pled, as they're asking us to assume it was, then I do think you have to do the Janus analysis on the assumption that we're dealing with the use of funds that would have existed outside IOLTA. I think there's still two differences, Your Honor. One, before we even reach the question of whether they felt compelled to place the money in an IOLTA account is the question of whether the attorneys were required to place funds or hold client funds in trust in the first instance. That's where there are specific allegations in Washington Legal Foundation about empirical impacts on the attorneys of trying to evade the IOLTA program. Those allegations don't exist in this case. They're simply the conclusory allegation that there's no practical alternative.  In terms of the client having, the client could dictate to the attorney, I don't want to provide you funds in trust. But I thought in Washington Legal didn't we say something about how the client usually has no idea what the attorneys are doing, and so the client might be differently positioned with respect to those deficiencies and allegations in terms of their ability to bring the Janus claim. My understanding of Washington Legal Foundation is functionally the client piggybacked on the attorneys in that matter, that functionally the attorneys were unable to practically avoid it because of, again, those specific allegations about the impact on their legal practice of trying to avoid the IOLTA program. You say it goes the other way. In other words, if they don't allege that they couldn't practically avoid it, then the client has no reason to be concerned. We have to assume it could have been practically avoided. I think that's correct. And there's no reason the client couldn't go to the attorney and say, I don't want to give you money in trust. Let's work out an arrangement so my money doesn't go towards IOLTA. And then on the Janus question, again, even if we assume that there is some sort of monetary impact because of this middle ground between properly putting money in an IOLTA account and properly putting money in an interest-bearing account where there's an error made that is a good-faith error that ultimately produces interest that would have been produced otherwise, there's still substantial differences. Again, there isn't money going directly to these organizations, and it's not for the express purpose of speech on behalf of the person providing the money. That's where the space between the individual client in this case and the speech of the particular organizations matters, in that it goes into the reasonability and the attenuation, the reasonability of the belief that Plaintiff Westcott or RJB had that these organizations were speaking on their behalf or that they were supporting the organization's speech. Counsel, though, I think you were arguing earlier and in your brief that our decision in Washington Legal Foundation had something to say about that, but I just don't know that I read it that way, in other words, the connection, because what we held in Washington Legal Foundation was that there was no impact on the plaintiff's First Amendment rights caused by the IOLTA rule because we concluded that the interest earned on the IOLTA account belonged to no one. And that holding, it seems to me, is no longer valid in light of decisions by the Supreme Court afterwards. So I didn't see us doing any other analysis about the attenuated nature of the connection, etc. I mean, it was at the very end of the opinion in 980, saying the money belongs to no one, it's not the client's money, and therefore there was no impact on the plaintiff's First Amendment rights. So really, what does Washington Legal Foundation teach us about the analysis we have to do here, in your view? There's a couple of pieces. In the context of, and this is where Abood actually matters, in the context of Washington Legal Foundation, it doesn't rely on Abood, but rather distinguishes it. I believe it's the paragraph right after Abood and Keller, those barge use cases are discussed. That's where the court describes sort of the takeaway is there has to be a reasonable belief that the attorney in that case has or that the client has that they are supporting the speech of those organizations. So that's the first thing that can be taken away from Washington Legal Foundation. Also, I would respectfully disagree that the decision solely turns on it being no client's funds. I believe the remainder of that paragraph, and I think the next paragraph, I apologize, I don't have the decision in front of me, talk about how there's no other allegations about there being compelled speech and how this money is created by an anomaly, functionally, an accounting anomaly where the net interest would not otherwise exist. And I think that's an important point that comes still out of the Brown decision, for example, which is, excuse me, let me take a drink of water here. That comes out of the Brown decision, which is there's no pecuniary loss. That's why there's no just compensation required in the Brown and Phillips line of cases because there's no pecuniary loss that's ultimately suffered because the interest would not otherwise exist. Just before you sit down, what about the argument that use is the subsidy? I don't think that's what plaintiffs have alleged here, Your Honor. Their argument, the very first argument... I take that because they've alleged that there was actually interest earned outside IOLTA, so it confounds things. But on this point, I'm just curious, the state's position. Suppose that they allege these were funds that would only have earned interest in IOLTA. It was too small an amount. Therefore, we had to put it in. Everybody agrees you had to put it in. Lo and behold, it earned some interest. That money was then used. And they acknowledge, okay, we wouldn't have had that money otherwise. It's purely a consequence of the pooling. But the use of our property to permit that to happen is the subsidy. Well, I think that's Washington Legal Foundation. Even if we grant that it had an incorrect premise, which I think you're right, there was an intervening Supreme Court case with respect to who owns the interest generated. The case, if it grants that premise, still deals with the underlying question. If it were true, Your Honor, that simply borrowing the money were a First Amendment violation, Washington Legal Foundation should have come out the opposite way. It didn't. And there's no other case law that suggests otherwise. At the time, I guess you could say of Washington Legal Foundation, it was not aware of what the court would say in Phillips, that the title to the property still was of some significance to the takings analysis. It didn't seem to grasp that or to have that in view when it made the point that it made. So I think that's why they would then say Phillips and Brown undermines the force of Washington Legal Foundation. It doesn't mean you've got to come out the other way. It just leaves open the question then, is use a subsidy for First Amendment purposes under Janus? If I may, I know I'm way over time. I think that's, again, you're correct that it wasn't aware of decisions that came after that decision came down. But it could have at the same time. It wouldn't have mattered. It would have been a moot point who owned the interest. Because if the simple borrowing of plaintiff's principle were sufficient to violate the First Amendment, it wouldn't matter who owned it. It would still be a violation of the First Amendment. We don't have cases that say that, and Washington Legal Foundation came out as it did. Thank you. Thank you, Your Honors. May it please the Court, Julia McDonald from Pierce-Atwood on behalf of Appellee Main Justice Foundation. Appellants suggest their purported injuries are redressable by Main Justice Foundation because the district court could enjoin MJF from, quote, distributing IULTA funds in a manner that causes the federal government to reduce the amount of IULTA funds   to subsidize speech on matters of substantial public concern. Yet appellants have never meaningfully addressed Judge Walker's conclusion below that such an order would be meaningless absent an order enjoining the state appellees from enforcing the rule, that an order so enjoining the state appellees would provide appellants with complete relief. Because MJF cannot redress appellants' purported injuries, the district court correctly concluded that appellants lack standing to pursue their claim against MJF. While appellants have never stated what specific actions they contend MJF should be enjoined to take or enjoined from taking, as a practical matter, appellants' proposed injunction would leave MJF with only two options, neither of which option is within the scope of MJF's authority. The first option would be for MJF to place restrictions on the funds distributed to the legal aid organizations such that the IULTA funded grant money cannot be used for speech on matters of substantial public concern. Yet appellants have not alleged MJF has the authority to place such restrictions on IULTA funds or to enforce such restrictions in the event a recipient fails to abide by them. That part of their argument I don't know that I follow. You have the authority to disperse them to those entities, correct? Correct, Your Honor. So if that creates a First Amendment problem and they enjoin you from doing it and the First Amendment problem goes away, how does it not redress the First Amendment point? It doesn't seem to be much of an answer to say, well, under the state statute we can't abide to those restrictions. That's what they say the First Amendment problem is with the statute. Well, Your Honor, I think it's relevant that appellants are arguing that MJF is akin to a state agency. And accepting that argument is true. A court cannot enjoin an agency to take actions that it is not within that agency's authority to take. And in this case – It's different to say you must do something you have no power to do. This is you're being restrained from something you're authorized to do that violates the First Amendment. That's what they're saying. That can't be that you're powerless to enjoin them from taking action that violates the First Amendment because state law authorized us to violate it. Well, Your Honor, I think practically there's two options. Enjoining MJF from distributing the funds to the recipient organizations who plaintiffs find their actions abhorrent. I think it's important to note that appellants have not alleged the existence of any other organizations that meet the qualifications of the rule but that they do not find abhorrent. And so essentially that injunction would enjoin MJF from distributing the funds at all. And absent an injunction against the state enjoining that enforcement, that injunction would be asking MJF to act outside its authority because – May I briefly conclude, Your Honor? MJF is required by the rule to distribute the funds. They are not allowed under the rule to cease distributing the funds. So absent a meaningful alternative, that injunction against MJF would require MJF to act outside of its authority. Wouldn't it just require it to do nothing? MJF doesn't have the authority to do nothing. If what it wants to do with the authority it has violates the First Amendment, then isn't that the purpose of an injunction to stop it from doing that? An injunction against the state enjoining the state appellees from allowing the funds to be used that way, that would allow complete relief for the appellants because there's no allegation that MJF would not follow the state's directive there. In fact, the allegation is that MJF follows the state's directive. And so any relief to appellants would flow from that injunction from the state and not from the injunction against MJF. Is that more of a scope of the injunction argument, though, rather than a standing argument, Counsel? Because I understand what you're saying, that for them to get complete relief, there doesn't need to be an injunction against your client. But the argument that you're making is an argument that lots of state officials could make, that I'm acting in compliance with state law. The injunction is going to force me to do something contrary to state law. But the whole point is that if federal law has been violated, that's exactly what a federal court can order. So is your argument really more about the scope of the injunction, that you don't need to be enjoined, because if the other defendants are enjoined, they'll get exactly what they want? Your Honor, I think it doesn't just speak to the scope of the injunction. I think it speaks to redressability because any relief flowing to appellants, again, would not be flowing from the injunction against MJF. It would be flowing from the injunction against the state appellees. Suppose they had only sued you. Yes. And you wouldn't be able to say there's no one else being sued. You're the only one. And they say if you stop doing what we'd like you to stop doing, the First Amendment problem goes away. Well, if they only sued MJF, I think that would create this issue where if the court enjoined MJF to either cease distributing the funds to the named legal aid organizations or to impose restrictions on the funds, the court would be in essence enjoining MJF to act outside the scope of its ‑‑ if you consider MJF a state agency, as they suggest, it would be directing MJF to act outside the scope of its ‑‑ I don't know what you mean when you say act outside the scope. They may ask them to not do stuff. They're not asking them to do things they're not authorized to do. They're asking them not to do things they are authorized to do. That's what injunctions always do. But MJF is not authorized by the court to decide to stop distributing the funds. MJF is required under the rule to distribute the funds. And they're saying that violates the First Amendment every time you distribute them, so stop doing it. What's the problem? I think the problem is that it would be ‑‑ the court would be enjoining, essentially, if you take for sake of argument a state agency, it would be enjoining a state agency to act outside of what is essentially its administrative authority. And so that's why in cases, in preenforcement challenges to statutes that compel obedience by penalties, that's why the appropriate defendant in that case is the state actor that compels compliance by way of penalties. Thank you, Your Honor. Thank you, counsel. At this time, would counsel for the appellants please reintroduce himself back on the record? He has a three‑minute rebuttal. Thank you, Your Honor. Kyle Singel for appellants. The interest earned outside of the IOLTA does not confound the fact that the money was still in IOLTA and money interest funds were distributed to recipients. There are two sets of money. There's the interest that would always accrue on all IOLTA deposited funds, and in this case, as alleged, there happens to also be whatever the net interest that would have accrued and been returned to the client had the money been stored in a non‑IOLTA fund. But so long as there is the proposition from Phillips and Brown that this is the client's money, the client has the right to use it, the interest that was given to the recipient organizations caused the First Amendment harm. But all the discussion about whether there would have been net interest or not simply goes to whether it was voluntary. And what I haven't heard is representation from opposing counsel that if we opt out, if plaintiffs opt out, that don't worry, everything's fine. What I've heard is suggestions to use an alternative funding arrangement or get a different lawyer. So if the opposing parties were going to take the position that any lawyer otherwise in good standing would face no consequence from making an incorrect decision to place IOLTA funds in a client trust account, then we might have a different complaint, though we would still have the problem that arises when the funds are placed in an IOLTA account, which is the use of the client's money permits funding of a cause the client opposes. Judge Rickleman, you asked about the typical amounts of money, and you asked about disciplinary reports. Those all sound like good factual questions that could elucidate the reasonableness or not of the plaintiff's decision to use the IOLTA in this case. Ultimately, the facts that led to interest accruing don't dispose of the claim. And even going back to Washington Legal Foundation, as long as the money is the client's money, even Washington Legal Foundation said that strict scrutiny applies in such a case once the money is then transferred to a cause the client opposes. If there are no further questions, Your Honors. Can I ask another question? And I'm sorry that I don't recall this from the briefs, but the retainer here was a specific type of retainer, I believe you said. Was it refundable or not refundable? It was a refundable retainer. A flat fee could be placed directly in the lawyer's operating account, I believe. And so, as you said, a lot of the questions that we're asking really do go to was there an alternative such that this wasn't compulsory, which is a critical part of the analysis. So can you just again, and I understand it's a motion to dismiss, but just practically speaking, was there an alternative to have a different type of retainer here? No, I mean practically. What is the relevance of the type of retainer that you alleged, I guess? It's simply that alleging that it's a refundable retainer, I guess, excludes the possibility that what if it was a flat fee, a non-refundable retainer that could have been placed in a non-IOLTA account, in the lawyer's operating account from the get-go, rather than going into any sort of trust account at all. At least in some jurisdictions, lawyers earn and can receive as operating funds a flat fee upon receipt. I don't know if that's true in the state of Maine or not, but whereas a refundable retainer against future services, although taxable at receipt, is not earned and accessible to the lawyer until the services are rendered. Thank you, Your Honors. We ask the Court to reverse. Thank you, Counsel. That concludes argument in this case.